Filed 9/17/20  In re A.J. CA4/2
See Dissenting Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E073808 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1900064) |
| v. | OPINION |
| M.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant M.C. (mother) appeals from orders made at a six-month review hearing in juvenile dependency proceedings involving her daughter (the child). She argues the juvenile court erred when it refused her request to examine the child's father (father) and when it ordered the child's return to father with provision of family maintenance services. We affirm.

## BACKGROUND

The child (born in July 2017) was taken into protective custody by respondent Riverside County Department of Public Social Services (the Department) in February 2019, following a domestic violence incident in which a gun was fired causing a leg wound to mother. Investigation revealed substantial substance abuse and domestic violence in the home.

The Department filed a juvenile dependency petition alleging the child came within subdivision (b) (2) of section 300 of the Welfare and Institutions Code[1] on account of the parents' abuse of controlled substances and because they engaged in domestic violence in the child's presence. The juvenile court sustained the petition, adjudged the child a dependent of the court, and placed her in mother's care with family maintenance services. It removed the child from father and ordered a family reunification plan as to him.

At the six-month review hearing, the Department recommended return of the child to father with provision of family maintenance services. Mother disagreed, arguing that

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

return would be detrimental to the child. She called the social worker and his supervisor to testify but the court denied her request to examine father. It adopted the Department's recommendation and ordered the child placed with both parents, with mother having primary custody. Family maintenance services were ordered for father and continued for mother. Mother appealed.

## DISCUSSION

1. The order returning the child to father

Mother argues the juvenile court erred when it ordered the child's return to father because there was sufficient substantial evidence to find return would be detrimental to the child's physical or emotional well-being.

a. *Mother's standing*

Before addressing mother's claim, we dispose of the Department's argument that mother lacks standing to raise her challenge to the court's order. Standing to appeal is construed liberally, with doubts to be resolved in its favor. (*In re K.C.* (2011) 52 Cal.4th 231, 236.) If a person's rights or interests are injuriously affected by the juvenile court's decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision, then that person has standing. (*Ibid.*) Here, the court's order had a sufficiently direct and immediate impact on mother's interest in her child's safety and well-being to accord her standing to challenge the court's order.

b. *The child's return to father*

In a case like the present one in which the juvenile court has removed a child from a parent's custody with provision of family reunification services, the court is required to conduct a review hearing six months after making that order. (§ 366.21, subd. (e)(1).) At that hearing, the court must return the child to the parent unless it finds by a preponderance of evidence that return to the parent would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (*Ibid.*) Here, the court did not find detriment to return and, therefore, placed the child back with father with provision of family maintenance services.

On appeal, mother argues that return of the child to father was in error because there was sufficient evidence to support a finding of detriment. Framing the analysis as a question of sufficiency of the evidence is not appropriate because the issue is really one of a failure of evidence, that is, the juvenile court concluded that the burden of proof to establish that return would be detrimental was not met. (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1226 (*Luis H.*); see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*I.W.*).) Our standard of review when the issue involves the failure of proof at trial is whether as a matter of law the evidence compels a finding in favor of the appellant. (*Luis H.*, at p. 1226.) To satisfy that standard, the evidence must be "(1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to

4

leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.*, at p. 1528.)

Here, the evidence does not compel a finding in favor of mother. Although father had not completed some components of his case plan, the social worker assigned to the family and his supervisor each concluded that father had effectively addressed the safety threats leading to the child's removal. Father had been testing clean since the child was detained and, by the time of the review hearing, he had completed a substance abuse class. He had also finished an anger management program, and accepted responsibility for how his anger played a role in the domestic violence in the home. He would be participating in domestic violence classes and counseling as part of his family maintenance services. There had been no further incidents of domestic violence or other hostility between the parents, who had by then obtained a divorce.

Father had demonstrated that he is a loving parent. He visited the child consistently and had unsupervised overnight visits that were appropriate and successful. Father was employed, lived with the paternal grandfather and stayed at times with the grandmother, both of whom were actively engaged in assuring the child's safety.

Mother points to language in section 366.21 that a prima facie case of detriment is made if a parent fails to participate regularly or make substantive progress in the treatment programs ordered by the court at the disposition hearing. (§ 366.21, subd. (e)(1).) She claims a prima facie case was established here because, according to

5

her, father "had not completed, much less even begun, most of the services ordered," and he failed to present substantial evidence to rebut the presumption.

Contrary to mother's claim, subdivision (e)(1) of section 366.21 does not require completion of services to avoid a prima facie detriment finding. (§ 366.21, subd. (e)(1).) It requires only that the parent participate regularly and make substantial progress. (*Ibid.*)

Mother points to the facts that father had not enrolled in an inpatient substance abuse program or a 52-week domestic violence program as prima facie evidence of detriment. We do not agree. The substance abuse program assessed father as not meeting the criteria necessary to receive either inpatient or outpatient services. He had not enrolled in a department-approved domestic violence program because he had not been referred to one, but he would be working on that component of his plan as part of family maintenance services.

Moreover, even if mother had established a prima facie case of detriment, the burden of proof did not shift from her to father as she posits. If a showing of detriment is made and contrary evidence is introduced, then the presumption has no further effect and the issue of detriment is to be determined on the evidence presented. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 561.) Here, as illustrated *ante*, the court considered the evidence before it—including the fact that father did not enroll in a 52-week domestic violence program during the six-month period under review—and determined the child could safely be returned to father with provision of family maintenance services.

2.   The denial of mother's request to call father as a witness

The court denied mother's request to call father to the stand for the purpose of ascertaining if he had benefitted from the services he had received.  On appeal, she argues the denial violated her right to due process.  We disagree.

It is well settled that a parent is entitled to due process in juvenile dependency proceedings.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.)  But, the process due is a flexible concept that depends on the circumstances presented and the balancing of factors.  (*In re F.S.* (2016) 243 Cal.App.4th 799, 809, disapproved on other grounds as stated in *Conservatorship of O.B.*, supra, 9 Cal.5th at p. 1010, fn. 7; see *In re Sade C.* (1996) 13 Cal.4th 952, 992.)  We evaluate the private interests at stake, the government's interest, and the risk the procedures used will lead to an erroneous decision.  (*Dakota H.*, at pp. 222-223.)  The essential characteristic of due process in dependency proceedings is fairness in the procedure employed by the state to adjudicate the rights of a parent.  (*In re James Q.* (2000) 81 Cal.App.4th 255, 265.)

Here, the issue before the court was whether it could safely return the child to father.  Resolution of that question did not involve state interference with mother's fundamental right to parent her child.  Even so, because mother did not agree with the Department's recommendation, the court permitted her to question the social worker and his supervisor to explore the issue of detriment if the child was returned to father's care. She complains, however, that without permitting her the opportunity to examine father, the court was without sufficient information about father's progress in services,

7

particularly with respect to addressing domestic violence issues, to arrive at a correct decision.  We are not persuaded.

The court considered mother's reasons for wanting to call father to testify and concluded it did not need his testimony to determine whether the child could safely be returned to father.  It noted that substance abuse had been at the root of domestic violence in their home and that the parents had since stopped using drugs and alcohol, they were no longer living together, and were instead living with their respective parents.  Father had completed an anger management program and there had been no suggestion that he had engaged in any hostile behavior following the February 2019 incident that resulted in mother being shot.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


RAMIREZ
P. J.


I concur:


FIELDS
J.


8

[*In re A.J.*, E073808]

RAPHAEL, J., Dissenting.

Does a trial court exceed its discretion if it prevents a party from calling its opponent to testify at trial, where the opponent's conduct and asserted rehabilitation are the central issue before the court, and where there is no reason to preclude the testimony?

Yes. That is a court depriving a litigant of a fair proceeding.

Less than eight months before the trial in this juvenile dependency case, the father shot the mother in the leg in front of their daughter A.J., leading to A.J.'s removal from the parents. She was soon returned to mother's custody, and the trial was concerned with whether there would be a "substantial risk of detriment" to two-year-old A.J. if she were returned to joint custody with father. By the time of trial, mother and father were divorced, and father was a felon, having pled guilty to two child endangerment charges.

Yet the court refused to allow mother's attorney to even call father to the witness stand. Instead, the court heard only from two representatives of the Riverside County Department of Public Social Services (the Department) about their view that father had become suitable to parent. Mother's counsel made clear that she wanted to question father about whether he had accepted responsibility for his domestic violence; he previously lied about it and he had failed to take any of the 52 weeks of classes required by his case plan. The court offered no justification for precluding father's testimony, and it had a responsibility to consider competent evidence that a party wished to present. In my view, precluding testimony from father, who could be mother's most important witness, was reversible error.

1

*A. Father's Domestic Violence*

On February 11, 2019, while father and mother quarreled under the influence of methamphetamine, he shot her in the inner thigh. Their child A.J. was about three feet away. As a result of the incident, mother went on crutches and took opioids for the pain. Seven months after the injury, mother was still in physical therapy and reported that she could "'run a bit now and lift things at work.'" She was also participating in a program for domestic violence victims.

Father lied about the incident. When he called the police, he reported that his wife had accidently shot herself. As father drove her to seek help, mother said father kept telling her to "'tell them it was all an accident, tell them you shot yourself. '" When interviewed by the police at the scene, and again when interviewed by a Department social worker for the detention report, father offered an account where he was not the shooter. He stated that he had placed his gun on a table, and, while he was in the shower, he heard a gunshot and discovered that mother had shot herself.

Mother reported that father had threatened to kill her in the past. On September 17, 2018, he had punched her in the face, resulting in a black eye and bloody nose. During that battering, A.J. was next to mother and had her face stained with blood splatter. A picture after that incident showed mother with blood dripping from a cut on her cheek. Mother said that father several times pushed or shoved her when A.J. was nearby. A.J.'s maternal grandfather reported that he had seen mother with a black eye

and bruises on her arms and legs. A neighbor reported that one week before the shooting, father had stated, "'I did it again'"; when asked what he did again, father responded, "'I whooped her ass.'" Father's 10-year-old daughter (who was placed with her own mother during the pendency of this case) stated that mother and father would fight, and he would punch mother, who once got a black eye as a result. At these times, father's daughter "would be so afraid she would shake, shiver, and cry" and she worried that she or A.J. would get hurt.

Father was arrested after the shooting, and A.J. was removed from the parents' care. A few weeks after the shooting, on March 5, 2019, a family law court granted mother a three-year domestic violence restraining order requiring father to stay at least 100 yards from mother, except for peaceful contact with A.J. required for any court ordered child visitation. The court required father to complete a 52-week domestic violence intervention program.

Meanwhile, the Department began this case by filing a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b). Among other things, the Department was concerned that A.J. would be exposed to further violence, putting her at risk of being emotionally and physically hurt.

The jurisdiction/disposition report did not include information from father about the shooting incident, as the court had ordered he was not to be interviewed about it due to his pending criminal charges. Father, however, said mother's allegation that he previously hit her in the face (presumably referring to the September 17, 2018 incident) was not true; she had injured her face falling while drunk. According to the

3

jurisdiction/disposition report, father nevertheless "stated he would benefit from domestic violence classes, and anger management."

At the jurisdiction/disposition hearing, father's counsel asked if father could do anger management counseling instead of domestic violence, and the court responded: "When I say I want him in a domestic violence class, I'm talking about the 52-week batterer's program." The court said: "The biggest component here is domestic violence" and advised father to enroll in the program to impress the judge in his criminal case. The court returned A.J. to mother's care and removed physical custody from father, providing him family maintenance services. Father's case plan included weekly counseling, parenting education, and a domestic violence batterer's program. It included him discussing what he had learned in counseling and in the domestic violence program and how it applies to him. Thus, the juvenile court, like the family law court, had ordered a 52-week domestic violence program.

### B. *The Six-Month Status Report*

By the six-month status review report dated September 19, 2019, the parties were divorced and mother still had custody of A.J. Father pled guilty to felony child abuse charges (not domestic violence charges) to resolve his criminal case. The Department recommended father share in the physical custody of A.J. and receive family maintenance services. This was because father had completed an anger management program and substance abuse treatment, and he had appropriately visited with A.J. However, father had not even participated in the required general counseling, parenting education, or 52-week domestic violence batterers program. The report stated that he could benefit from

4

that domestic violence program, but because he and mother "are no longer in a relationship and no longer reside together, the safety threat posed by domestic violence has been addressed."

*C. Mother's Explanation of Her Challenge*

At a hearing on September 19, 2019, mother's counsel explained to the court that she wished to contest A.J.'s placement with father, and the court set a trial date for October 1, 2019. In requesting this trial, mother's counsel explained in detail why father's conduct prompted her challenge.

First, although father "was ordered to do the 52-week domestic violence batterers program as part of his case plan. . . . He has not done it. He has not participated in [the] domestic violence [program] at all." Second, although father completed a required anger management class, "[h]e never did the parenting class, and he has not participated in any counseling." Third, father "has continued to maintain his position: no domestic violence; that mother shot herself." In counsel's view, father had maintained that position despite independent witnesses and evidence confirming father's domestic violence. Fourth, father had lied by continuing to deny using methamphetamine, even though blood tests indicated otherwise. In counsel's view, father had "never accepted responsibility."

5

Mother's counsel further explained her concern that the Department officials involved in the case did not have a social worker's background and did not understand the situation that a "vulnerable child" was being put into, arguing that this "is a very serious case" and that "nothing was done regarding domestic violence and what [father] was ordered to do, let alone counseling or parenting."

### D. Mother's Request for Father's Testimony at Trial

At the outset of the October 1, 2019 trial, mother's counsel explained that the case started with the allegation that A.J. was subject to physical and emotional abuse by being exposed to domestic violence, after mother was shot with A.J. nearby. Yet, when interviewed for the detention report, father denied any domestic violence despite evidence that it had occurred.

At this point, counsel indicated that she was going to call father to the witness stand. Father's counsel objected, without providing a basis. Mother's counsel then pressed a vigorous case for why she should be permitted to question father. She explained that Welfare and Institutions Code section 366.21 required the court to determine by a preponderance of the evidence whether return of A.J. to father would create a substantial risk of detriment to A.J. Whether father had made "substantive progress in court-ordered treatment" was relevant to that determination. Although the court had ordered a 52-week domestic violence class, father had not started that; he had not done required parenting classes or counseling; and father had denied using methamphetamine and committing domestic violence and had never accepted responsibility for those things. Domestic violence, counsel argued, is not the same as the

6

anger management class that he completed. Further, she stated, he committed domestic violence before shooting mother in this case, has "continued blaming the mother" and "told the police that mother shot herself."

Thus, counsel explained, "[m]y client is very concerned. Domestic violence—it has not been addressed. I would like to know if the father has accepted any responsibility for any of this, because if he's minimizing the behavior, there is still a risk." In response, the court indicated that domestic violence may no longer be a concern "when the mother is not in the picture." Counsel's rejoinder was that domestic violence is still a concern because the couple must deal with each other for 17 years concerning A.J.

Mother's counsel further pointed out that father agreed under his case plan to identify things that upset him and led to arguments and physical violence with mother. He agreed to discuss ways to prevent those behaviors, and to give examples of when he's able to avoid them.

Thus, mother's counsel said, she disagrees with the Department's view that the risk from releasing A.J. to father was acceptable, and she summed up in the following way: "I would ask for [father] to take the stand so that I can question him when the Department takes the position . . . that he has effectively addressed the safety threats that led to [A.J.]'s removal from his physical custody. I would like to question him on that. I believe I have a right to cross-examine." The court responded by saying that counsel may question the social workers, but it was "not so certain about" whether counsel could question father. The court reserved the question to "think about . . . since we have all afternoon."

7

*E. The Two Department Witnesses*

Mother's counsel called one of the Department representatives as a witness, and she focused much of her questioning on whether father had accepted responsibility for his domestic violence. The witness acknowledged that father had taken none of the required domestic violence classes. But the witness stated that he believed father had accepted responsibility for his domestic violence by accepting responsibility for the "role that his anger played in the domestic violence." Specifically, father had identified that his trigger for being angry with mother was coming home and seeing the house a mess and mother "not doing stuff" at the house. After mother's counsel attempted a series of questions that involved asking the witness whether this was "actually still blaming" mother, the trial court asked counsel to explain how her questioning related to the "substantial risk of detriment" to the child, if mother was not present when A.J. was with father..

Mother's counsel responded: "[I]t's a domestic violence case. . . . The evidence and literature is out there that shows that even within two years my client is at risk of being killed by him. He has already shot her. . . . [T]he research has shown that people that are batterers don't just get better . . . .

"The child herself is in the home. He has not participated in a program to address domestic violence. He has not participated in counseling. He has not addressed any of these issues, and yet he has never accepted responsibility from the beginning of this case. He has always said 'It didn't happen. It wasn't me. She had issues. It was her.' "

After the lunch recess, the Department witness testified that father had "begun to address the domestic violence with the anger management program." He conceded that

the anger management class was the only way father had addressed the domestic violence. He had no particular reports about father's progress in the anger management class, however, just a certificate of completion.

Mother's counsel next called a second Department witness. That witness testified that father had addressed domestic violence because "There hasn't been a domestic violence incident since the onset of this case. I think that speaks for itself." She testified that, pursuant to a tool the Department uses, father presented a "moderate" risk to the child's safety. The witness conceded that whether a person has benefitted from services is one thing that the Department looks at in evaluating risk, and father had not participated in domestic violence services. In her view, domestic violence was addressed because the parents were no longer living together, and because the father had completed an anger management program.

*F. The Court's Preclusion of Father as a Witness*

Following this witness, mother's counsel renewed her request to call father as a witness. The Court denied the request without stating a reason:

"[Mother's Counsel:] I would like to call [father].

"[Father's Counsel:] I object to that, Your Honor.

"THE COURT: The Court declines that request. You can appeal me later on if you want. I'm not going to allow you to question him.

"[Mother's Counsel:] I'm objecting to that, Your Honor. I do believe that in order to ascertain whether he has benefitted from services based on what little is

9

contained here, in order [for] the Court to make a finding. . . . I do believe it is relevant, and I am objecting to the Court not allowing that.

"THE COURT: Your objection is noted. I already ruled. You are not calling him."

*G. The Court's Return of the Child to Father*

The court then made its ruling returning A.J. to father's joint custody. As to domestic violence, the court stated that "the bottom line is that the exposure of domestic violence to the child is absent." The court stated that it had "no indication since February of this year that he's done anything to violate any [domestic violence restraining] orders issued by the family law court." Thus, the court did not see any substantial risk of detriment to A.J. The court told counsel that even if father had signed up for domestic violence classes, "there's no way he could complete a 52-week[] class" by that point. The court recognized domestic violence is serious, but "this man has made attempts to comply with the case plan" and should not have continued "removal of custody" from him. The court awarded father custody of A.J. from Wednesday to Sunday every other week, with continued family maintenance services.

II

DISCUSSION

Father's testimony was obviously relevant at this trial. Just eight months earlier, he shot mother with A.J. present, lied about it and minimized his earlier domestic violence, never admitted his acts later, and had not yet taken any of the court ordered 52-

10

week domestic violence batterer's program.  Mother appropriately requested to question him, yet she was rebuffed without reason.  We should reverse.

We frequently see appeals in which a court shapes a trial around its edges through supervisory or evidentiary rulings.  Rare is an appeal like this one, where a court outright deprived a party of the right to call a central trial witness—indeed, one present in the courtroom.  Mother's trial position was that father had not demonstrated that he had come to grips with his domestic violence, increasing the risk that A.J. would be exposed to violence he commits.  The best evidence of father's acceptance of responsibility would be hearing what father has to say about his domestic violence and perhaps evaluating his credibility.  The trial court refused to hear this.

Our Supreme Court, describing the "fundamental right to present evidence at trial in a civil case," has quoted a leading treatise as stating that " 'One of the elements of a fair trial is the *right to offer relevant and competent evidence on a material issue.*  Subject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence . . . , and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error' " (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357, quoting 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 3, pp. 28–29).  That is, "a trial judge should not determine any issue that is presented for his consideration until he has heard all competent, material, and relevant evidence the parties desire to introduce." (*Elkins*, *supra*, at pp. 1357-1358, quoting *Shippey v. Shippey* (1943) 58 Cal.App.2d 174, 177.)

11

Trials in juvenile dependency matters are subject to the same fundamental due process concerns as any case. A parent in a juvenile dependency proceeding has "substantial private interests at stake" and "parents have significant dignity interests in being fully and fairly able to present their sides." (*In re Malinda S.* (1990) 51 Cal.3d 368, 383-384, superseded by statute on another ground as stated in *People v. Otto* (2001) 26 Cal.4th 200, 207.) As such, "[j]uvenile courts do not deny parents the right to cross-examine adverse witnesses." (*In re Malinda S.*, at p. 384; *Fewel v. Fewel* (1943) 23 Cal.2d 431, 433 [reversal of child custody order where parent was precluded from cross-examination of investigator].)

At the six-month review hearing in a dependency case, a court is to return a child to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 366.21, subd. (e)(1).) In making this determination, the court is to "consider the efforts or progress . . . demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided." (*Ibid.*) The parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs" is "prima facie evidence that return would be detrimental." (*Ibid.*)

Here, mother sought to have the court consider evidence of father's progress in dealing with domestic violence. Whether father had accepted responsibility for his violence, and whether he was committed to eliminating it, bore on his efforts and progress in eliminating the reasons for this dependency case. One of the reasons for the

12

dependency was to prevent A.J. from being physically or emotionally harmed by domestic violence, which had occurred in her presence. Father had initially lied about his shooting of mother. The trial court and the Department had made a 52-week domestic violence program a part of father's case plan, and a family law court had required it too. Father had not started that program, and, under the statute, that failure was at least relevant to the statutory "prima facie" showing "that return would be detrimental" due to not participating "regularly and making substantive progress in court-ordered treatment programs." (Welf. & Inst. Code, § 366.21 subd. (e)(1).) Father's case plan even included requiring him to discuss what he had learned in the domestic violence program and how it applied to him.

In other cases, agencies have taken the position that a parent's failure to take responsibility for domestic violence is a factor counseling against the return of a child. (See e.g., *In re A.K.* (2017) 12 Cal.App.5th 492, 497 [recommending termination of reunification services where a father completed many requirements but continued to minimize his role in domestic violence and deny that it occurred].) Here, the court denied mother the ability to even obtain testimony from father that would bear on his minimizations or denial of his violence.

We do not know how father would have testified. But the relevance of father's testimony can be seen by considering the polar extremes of the testimony he might offer. On the one hand, father might have acknowledged his past violence and demonstrated a commitment to fixing it in accordance with the case plan. If so, mother's concerns may have been eased; the trial court surely would have ruled no differently; and there would

13

be little basis for bringing this appeal, where its lynchpin was a claim that the record was devoid of father's "insight into his own conduct." On the other hand, confronted with mother's counsel's questioning, father might have dissembled or appeared not seriously committed to dealing with his domestic violence. If so, mother could have made a stronger case for a different ruling: delaying the return of A.J. to father's custody, or imposing some stricter conditions on that custody. We cannot know whether the trial court would have been swayed even with troublesome testimony. But if it were not, we would have faced a much more difficult question in this appeal as to whether sufficient evidence supported the court's ruling, perhaps turning on the particular reasoning the trial court articulated.

While we cannot know how father would have testified or its impact, there was simply no reason to deny mother's request to introduce that testimony. Neither father nor his counsel ever provided a reason. Consumption of time was never raised as an issue, as the court had "all afternoon" for the trial, and father's testimony likely could have been time limited if that were somehow a problem. Additionally, as mother's counsel pointed out, father had "never invoked" his right against self-incrimination, and, as the court further observed, father's criminal case was for that purpose completed due to his guilty pleas.

Although the court provided no express reason for denying father's testimony, there are indications of an erroneous and dispiriting argument for that testimony's irrelevancy. The Department's six-month review report stated that because the parents are no longer under the same roof, "the safety threat posed by domestic violence has been

14

addressed." At one point, the court nodded toward this view, inquiring of mother's counsel why domestic violence is still a concern when "the mother is not in the picture." Somewhat similar to that view is the claim that because father had achieved eight months without committing further domestic violence, there was no longer a safety concern. As the Department's witness put it at trial, "[t]here hasn't been a domestic violence incident since the onset of this case. I think that speaks for itself." Similarly, a feature of the court's ultimate ruling was that it had "no indication since February of this year that he's done anything to violate any . . . domestic violence restraining orders issued by the family law court."

If these views provided the basis for excluding father's testimony as irrelevant, we should roundly reject them. Concerns about the effect of domestic violence on the children are not eradicated because parents have divorced. For one thing, there will be regular contact between the parents for many years when they drop off A.J. as she changes the parent she is visiting, as well as in scheduling and attending a myriad of activities and events as she grows up. For another thing, A.J. could be in father's home when he is with a new partner; even at the time of the six-month report, father stated that he was "considering pursuing a relationship" with an individual. "[P]ast violent behavior in a relationship is the best predictor of future violence. Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships. . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner." (*In re R.C.* (2012) 210 Cal.App.4th 930, 942 [citing secondary authority].)

As well, domestic violence concerns do not vanish simply because a parent has made it eight months without battering someone. (See, e.g., *United States v. Bryant* (2016) __ U.S. __, [136 S. Ct. 1954, 1959] ["As this Court has noted, domestic abusers exhibit high rates of recidivism, and their violence 'often escalates in severity over time'"], quoting *United States v. Castleman* (2014) 572 U.S. 157, 160; *United States v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1141, 1142 [noting studies showing high domestic violence recidivism rates and rejecting claim that "if a domestic abuser has not committed domestic violence for fifteen years, that abuser is highly unlikely to do so again"].) We need look no further than our record to see that both the court and the Department accepted—at least for some purposes—that father's domestic violence remained relevant: completing the 52-week domestic violence program remained part of father's case plan even after the six-month hearing.

Of course, the parents' circumstances and the perpetrator's recent record are relevant considerations for the court in evaluating the evidence as to the risk of future domestic violence on a child. But the circumstances did not constitute a reason to wholly preclude father's testimony on a view that any proclivity to domestic violence has been rendered irrelevant or refuted. Due to the possible effect on the children, as well as the danger to mother, the stakes are high: A.J. was splattered with mother's blood once, and present for a shooting another time; father's older daughter has had to "shake, shiver, and cry" through nearby violence. Nevertheless, the trial court outright refused to allow the perpetrator of that violence to be questioned on the steps taken to prevent any repetition, and returned A.J. to his custody.

16

Put simply: there was no sound reason for the court to deny mother's counsel even a modest time to question father as requested. And it should matter greatly how father testifies about his past domestic violence and his future efforts to avoid it.

III

Given the rulings in this case, I certainly hope that father in fact has addressed his domestic violence so that A.J. is not exposed to it while in his household. Our record ends with the six-month review hearing, and A.J. has many more years as a minor.

But the reasons for requiring dependency courts to hear first-hand testimony from a parent (at least when requested to do so) go beyond this case. The determination of whether a return of a child subjects her to a substantial risk of detriment is one for the *court* to make. (Welf. & Inst. Code, § 366.21, subd. (e)(1).)

The court is not tasked with deferring to the Department's view by passively reviewing it for reasonableness. Rather, the court is charged with making an independent determination. The agency's conclusions "are merely the starting point, not the ending point of the analysis. . . . The final, and actual, judgment on the issue belongs to the court, not to [the Department]." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 797.) Limiting the evidence to the Department's witnesses and failing to evaluate the parent himself when asked to do so is an abdication of the court's responsibility. Mother's counsel made a clear case for calling the father as a witness. We should encourage trial courts to hear all of a parent's relevant evidence, subject to normal evidentiary and trial management rulings. Hearing relevant evidence most definitely includes hearing testimony from the very parent whose asserted rehabilitation is at issue.

17

There is perhaps no more important evidence.  With hope that we one day will change our perspective, I respectfully dissent.

RAPHAEL             

J.